UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIM SHERIDAN,

    Plaintiff,                                  Civil Action No. 05-72447

v.                                           HON.  NANCY G. EDMUNDS
                                              U.S. District Judge
                                              HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL              U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Kim Sheridan brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits (DIB) under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On September 9, 2002, Plaintiff filed an application for Disability Insurance Benefits (DIB),  alleging an onset of disability date of February 16, 2001 (Tr. 47-49). After the initial denial of her claim, Plaintiff filed a request for an administrative hearing, held on

August 6, 2004 in Oak Park, Michigan before Administrative Law Judge (ALJ) Patrick Golden.  Plaintiff, represented by attorney Lisa A. Welton, testified (Tr. 260-279).  Dr. Asa J. Brown, Ph.D., a Vocational Expert (VE), also testified (Tr. 279-283).  On October 8, 2004, the ALJ found that Plaintiff retained the ability to perform her past relevant work (Tr. 21-22).  On April 27, 2005, the Appeals Council denied review (Tr. 5-7).  Plaintiff filed for judicial review on June 21, 2005.

## BACKGROUND FACTS

Plaintiff, born September 12, 1960, was age 44 when the ALJ issued his decision (Tr. 23).  She completed 12th grade and formerly performed both custodial and clerical work (Tr. 54, 59).  Plaintiff alleges disability due in part to a June, 2000 surgical blunder resulting in permanent left foot problems as well as a ruptured disc, immunoglobulin deficiency, and severe carpel tunnel syndrom ("CTS") (Tr. 53, 60).

### A.    Plaintiff's Testimony

Plaintiff reported that she last performed full-time work in February, 2001, but briefly held a part-time clerical position in October, 2001 (Tr. 260).  She alleged that she was unable to sit for more than an hour without experiencing discomfort due to arthritis and spinal disk problems, but denied back surgery or physical therapy for her back condition (Tr. 261).  She reported seeing a rheumatologist at least once a month (Tr. 261). Plaintiff, testifying that she lived with her husband and adult son, stated that she performed very little housework, indicating that she performed chores in short increments (Tr. 263).

Plaintiff, 43, a high school graduate, reported working full-time most recently as night

custodian, adding that foot problems obliged her to quit her job (Tr. 263). She estimated that her custodial work required her to lift up to 50 pounds (Tr. 263). She testified that before working as a custodian, she had worked for a mailing company collating documents and stuffing envelopes (Tr. 264). She added that her clerical jobs also required her to lift up to 50 pounds (Tr. 256).

Plaintiff testified that foot surgery performed in June, 2000 worsened rather than improved her foot condition, reporting that she could not place weight on her left foot (Tr. 267). She stated further that another doctor had informed her that her Achilles tendon was detached (Tr. 267-268). She acknowledged that she walked without an assistive device with the help of an orthopedic boot (Tr. 268). She reported taking three to four Vicodin each day for pain, stating that she along with foot pain, she experienced a swollen leg (Tr. 270). Plaintiff estimated that she spend most of the day reclining as a result of foot, leg, and back problems (Tr. 270).

In addition to the aforementioned conditions, Plaintiff testified that she experienced CTS, reporting that she wore wrist braces at night (Tr. 271). She indicated that an April, 2002 nerve conduction study showed that her hand and wrist problems had deteriorated due to CTS (Tr. 271). She stated that she also experienced tennis elbow, indicating that the combination of wrist and elbow problems prevented her from performing more than minimal household chores (Tr. 273). Plaintiff also reported that she took migraine medication at least once a week for recurring headaches (Tr. 274). She complained that an immunolglobulin deficiency made her more susceptible to infections (Tr. 275). She further alleged abdominal

pain from endometriosis and indicated that she suffered from depression, adding that she had seen a counselor on two or three occasions but had stopped treatment after the counselor went out of town (Tr. 276). Plaintiff reported that depression made her moody and withdrawn (Tr. 276).

Plaintiff alleged that she no longer shopped without assistance and did not maintain any outside interests (Tr. 277). She estimated that she could lift no more than 10 pounds, sit for a maximum of one hour, and stand for "way less" than an hour (Tr. 277). She approximated that she could walk a maximum of 200 feet before experiencing discomfort (Tr. 278). She denied an ability to climb, crouch, crawl, kneel, or bend, but acknowledged that she continued to drive short distances (Tr. 278). She reported that one to two days each week she was unable to "do anything" (Tr. 279).

### B.    Medical Evidence

#### i.  Treating Sources

In June, 2000, Plaintiff underwent an excision of Haglund Deformity of her left foot after complaining of pain for several months (Tr. 117). In December, 2000 Allan M. Grant, M.D. examined Plaintiff at the request of her treating physician Newton Rottenberg, M.D. (Tr. 185). Dr. Grant, noting that Plaintiff had recently undergone foot surgery, found she experienced moderate tenderness to palpation and calf atrophy, recommending that she undergo physical therapy (Tr. 186). In May, 2001, Dr. Rottenburg began a series of B-12 injections to the elbow and knees (Tr. 122-123). Also in May, 2001, Plaintiff sought treatment from orthopedist Jeffrey Lawley, D.O., for left heel pain (Tr. 156). Dr. Lawley,

-4-

noting that Plaintiff was "relatively pain free when she is either sitting or lying down," recommended the placement of a protective cast (Tr. 156). In August, 2001, Plaintiff received a temporary cast (Tr. 152). The next month, Plaintiff indicated that cortisone injections for complaints of right elbow pain provided relief for three to six months (Tr. 147). Notes from an October, 2001 exam show that Plaintiff exhibited a full range of elbow motion (Tr. 143).

In March, 2002 David T. Touchton, D.P.M. found that Plaintiff had a severe iatrogenic deformity with severe dysfunction of her left foot secondary to . . . [the December, 2000] surgery," with multiple adhesions resulting in "fixating of the tendon to the outer skin so that dorsi or plantary flexion is restricted and painful" (Tr. 121). He found further that Plaintiff's ankle and foot condition "compromise[d] her posture causing lordosis and scoliosis (Tr. 121). He concluded that Plaintiff would require "orthopedic devices and special shoes" for the rest of her life (Tr. 122).

In April, 2002, needle conduction studies showed "severe right median mononeuropathy at the wrist ([CTS]) with focal demyelination as well as chronic denervation" (Tr. 190). The same study showed moderate left CTS "most likely related to the repetitive use of her hands and may also be in association with ankylosing spondylitis" (Tr. 190). The report concluded that surgical treatment "may be considered" for both sides (Tr. 190). In November, 2002, imaging studies of Plaintiff's right foot showed "minimal degenerative arthritis" (Tr. 187). A physical therapy discharge report from June, 2003 stated that Plaintiff had experienced only minimal improvement after a month of physical therapy

(Tr. 176). In July, 2003, Dr. Lawley administered cortisone injections for recurring elbow pain (Tr. 223). He discharged Plaintiff from his care, cautioning her that she should avoid repetitive or forceful squeezing, grasping, and lifting activities using her hands (Tr. 223).

In October, 2003, Dr. Rottenburg opined that Plaintiff's prognosis was poor to fair based on ankle, knee, elbow, neck, spine, hip, and arm conditions (Tr. 177). Rottenburg found further that Plaintiff could stand or sit for no more than one hour per workday; lift a maximum of five to ten pounds on an occasional basis and zero to four on a frequent basis (Tr. 179). The assessment stated additionally that Plaintiff experienced either marked or extreme postural limitations as well as upper and lower extremity limitations (Tr. 179-180). Rottenburg also found that she experienced drowsiness as a result of pain medication. He estimated that Plaintiff's medical conditions would require her to miss more than four days of work each month (Tr. 180).

### ii. Consultive Sources

In October, 2002, Seth D. Cohen, M.D. examined Plaintiff on behalf of the Social Security Administration (Tr. 165). He noted that Plaintiff had a 20 year history of being diagnosed with bilateral CTS but had not undergone surgery (Tr. 165). He noted further that although Plaintiff had received a prescription for upper extremity braces, she was not wearing them during her examination (Tr. 165). Deeming Plaintiff "marginally cooperative," he observed "mild tenderness of the lumbosacral spine" (Tr. 166). However, the "range of motion" form contains his remarks that "[t]esting of the [lumbar spine, hip, knee, and ankle] is NOT properly attempted by examinee" (emphasis in the original) (Tr. 173).

In December, 2002, a Residual Functional Capacity Assessment found that Plaintiff retained the ability to lift 20 pounds occasionally, and 10 pounds frequently; sit, stand, or walk for six hours in an eight hour workday; unlimited pushing and pulling in the upper extremities; and occasional pushing and pulling in the lower extremities (Tr. 110). Noting that Plaintiff experienced achilles tendinosis, the report found further that Plaintiff was limited to occasional climbing, crouching, or crawling; and frequent balancing, stooping, and kneeling (Tr. 111). The assessment limited Plaintiff to frequent gross manipulations, and avoidance of concentrated exposure to vibration, due to CTS, but did not contain any other manipulative, visual, communicative, or environmental limitations (Tr. 112-113). The report concluded that Plaintiff's allegations of the severity of ambulatory, sitting, and manipulative limitations were only partially credible (Tr. 114).

### C.     Vocational Expert Testimony

VE Asa Brown, Ph.D., placed Plaintiff's former work as a custodian at the light to medium level of exertion, and her collating work as unskilled at the medium level, classifying both jobs as unskilled (Tr. 279). He found that Plaintiff also held a number of semi-skilled clerical positions which required a sedentary level of exertion (Tr. 279-280).

The VE opined that if Plaintiff's allegations of limitations were fully credited, she would be unable to perform any full-time work due to her stated need to recline for large portions of the day as well as her alleged symptoms from migraine headaches (Tr. 281). He stated further that Plaintiff's CTS, immune system imbalance, and depression would "cluster" to form another preclusive group (Tr. 281). The ALJ then posed the following

question:

> "All right, let's assume that she suffers from depression, and she suffers from pain in various parts of her body, but is able to lift up to 20 pounds. Is able to walk six of eight hours, sit two hours and retains enough concentration to be able to perform somewhat complex tasks. What affect if any, would that have on her ability to do any of the jobs you've mentioned?"

VE Brown testified that based on the above limitations, Plaintiff retained the ability to perform her former position as a semi-skilled clerical worker (Tr. 282). He indicated that clerical work could be performed despite Plaintiff's alleged upper extremity limitations, reasoning that "[c]lerical people will use whatever hand they want, and they're not working full-time, they work at bursts" (Tr. 282). He noted however, that clerical work required "at least the average industrial use of both upper extremities" (Tr. 282). He testified that his findings were consistent with the information found in the Dictionary of Occupational Titles ("DOT")(Tr. 280).

### D. The ALJ's Decision

Citing Plaintiff's medical records, ALJ Golden found that Plaintiff experienced the severe impairments of status post partial calcaneous ostectomy of the left foot; moderate to severe bilateral carpal tunnel syndrome; mild degenerative changes at L3-4 and L4-5; endometriosis; and bilateral epicondylitis, but that none met or medically equaled the listed impairments found in Appendix 1, Subpart P, Regulation No. 4 (Tr. 22).

The ALJ found further that Plaintiff's depression, not alleged until April 25, 2003,

could not be identified prior to September 30, 2002, the day her insured status expired (Tr. 17). The ALJ also declined to include Plaintiff's alleged problems stemming from migraine headaches, immunolglobulin deficiency, and cervical spine problems among Plaintiff's severe impairments (Tr. 18).

The ALJ found that Plaintiff retained the following residual functional capacity (RFC), allowing her to

> "lift 10 pounds occasionally; lift less than 10 pounds frequently; sit, stand or walk for a total of eight hours in a work day; push or pull without limitation; perform postural activities at least occasionally; perform manipulative functions that do not require repetitive or forceful squeezing, grasping and lifting activities with her hands; see, hear and speak without limitation; and perform work in any environment. Mentally, the claimant can understand, remember and carry out somewhat complex instructions; make judgments on somewhat complex work-related decisions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a usual work setting."

(Tr. 21). ALJ Golden concluded that Plaintiff retained the capacity to perform semi-skilled clerical work at the sedentary level of exertion (Tr. 21). He concluded that Plaintiff's allegations of limitations were only partially credible, citing her disinclination to undergo surgery for CTS; her appearance and demeanor at the hearing; and her admission to a healthcare provider that "she was relatively pain free while sitting and lying down" (Tr. 19, 20).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. Listing 1.02

Plaintiff argues first that the ALJ erred by failing to find her disabled at Step Three of his analysis, arguing that she meets the criteria for disability under Listing 1.02. *Plaintiff's Brief* at 28. She contends that the presence of a severe ankle deformity coupled with severe bilateral wrist and elbow conditions exceed the requirements of the listing. *Id.*

The pertinent portion of 20 C.F.R. Part 220, Appendix 1, § 1.02A states as follows:

> " *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: (A) Involvement of one major peripheral weight-bearing joint (i.e ., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]"

The regulations define "ineffective ambulation" as an

> "extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."

20 C.F.R. Part 404, Appendix. 1, § 1.00B2b.

Substantial evidence supports the ALJ's determination that Plaintiff did not meet listing §1.02A. First and most fundamentally, Plaintiff acknowledged at the administrative hearing that she did not use an assistive device, thus defeating her argument that her upper extremity functions are limited by a hand-held device (Tr. 268). Next, her ADLs, which indicate that she continued to dust, vacuum, cook, and wash dishes - all without the help of an assistive device - stand at odds with her claim of disability under §1.02A (Tr. 92).

Likewise, Plaintiff's argument that she is entitled to disability under listing §1.02B founders on her admitted ability to perform fine and gross upper extremity movements in activities such as dusting, driving a car, preparing dinner for her family, and flipping the pages of a book, magazine,or newpaper (Tr. 92-93). Section 1.02B requires the "inability to perform fine and gross movements effectively as defined in 1.00B2c," i.e., "an extreme loss of function of both upper extremities . . . that interferes very seriously with the . . . ability to independently initiate, sustain, or complete activities." *Fischer-Ross v. Barnhart,* 431 F.3d 729, 735 (6th Cir. 2005); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02B. Given Plaintiff's continued ability to perform a range of fine and gross

manipulations, the ALJ permissively rejected her claim of disability under the listings.

### B. Treating Physician[1]

Plaintiff argues next that the administrative decision failed to accord appropriate weight to Drs. Rottenburg and Touchton's opinions. *Motion* at 30. Citing *Wilson v. Commissioner of Social Security*, 378 F. 3d 541 (6th Cir. 2004), she maintains that their findings, standing unopposed by other record evidence, should have been adopted by the ALJ.

Generally, "the reports of physicians who have treated a patient over a period of time . . . are given greater weight than . . . physicians employed and paid by the government" *Allen v. Califano,* 613F.2d 139, 145 (6th Cir. 1980); 20 C.F.R. §404.1527(d) (evaluating evidence from treating sources). *See Jones v. Secretary of*

---

[1]Plaintiff also argues that the ALJ's credibility determination was deficient, asserting that Golden rejected her subjective complaints of pain on the basis that "she looked tanned and did not appear to be in discomfort in the hearing." *Motion* at 33 citing Tr. 20.          Pursuant to *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993) the courts cede enormous latitude to the ALJ's credibility determinations. Substantial evidence found throughout the record supports the ALJ rejection of her allegations of disability. The ALJ's credibility determination and his rejection of treating physicians Rottenburg and Touchton's opinions draw in large part on the same portion of record evidence and accordingly fail on similar grounds. Therefore, those arguments will be discussed in tandem.

Likewise, the ALJ discussed his reasons for rejecting the Plaintiff's alleged degree of limitation created by spinal problems and migraine headaches (Tr. 18). As noted above, Dr. Lawley reported that Plaintiff was "relatively pain free when she is either sitting or lying down" (Tr. 156). The ALJ pointed out that although Plaintiff had taken Fiorcet for "many years," her headaches had not prevented her from working during that time. The ALJ was permitted to reject Plaintiff's claim of chronic inertia due to side effects from medication based on her admission that she continues to drive, along with the "impressive" cognitive abilities she demonstrated at the hearing (Tr. 20).

*Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991)( "[I]t is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference.") In *Wilson, supra,* 378 F.3d at 544 the court stated:

> "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

However, while deference to the treater's findings is the rule, Sixth Circuit case law does not go so far as to require the ALJ to adopt a medical opinion which stands at odds with substantial portions of the record. In *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 (6th Cir. 2004), the court found first that the ALJ's rejection of the treating physician's conclusion was based on substantial evidence, and second, that the ALJ properly supported his finding by citing other portions of the record that conflicted with the treating physician's opinion.

Contrary to Plaintiff's argument, the analysis performed by ALJ Golden comports with the requirements set out in 20 CFR 404.1527(d) by discussing Plaintiff's examining and treating relationships with Drs. Rottenburg and Touchton. Further, pursuant to *Warner, supra,* 375 F.3d at 391, the ALJ properly supported his rejection of the Rottenburg's disability pronouncement by citing other portions of the medical record which conflicted with the treating physician's opinion.

Pursuant to *Wilson, supra*, Dr. Rottenburg's opinion is entitled to consideration in deference to his longstanding treatment relationship to Plaintiff. However, *Wilson*, which also requires the ALJ to assess "the supportability of the opinion" and the "consistency of the opinion with the record as a whole," permitted the ALJ to discount portions of Rottenburg's opinion based on the fact that they stood at odds with Plaintiff's acknowledged activities. As discussed in Section A., Plaintiff continued to cook, clean, drive, read periodicals, and visit relatives. Although Plaintiff discounts the ALJ's observation that she was tanned and did not exhibit postural limitations during her half hour hearing, he permissively took her demeanor into account when assessing the limitations claimed by both Plaintiff and her physicians.

The ALJ's conclusions are further supported by health care records suggesting that Plaintiff's limitations were less severe than stated by Rottenburg. Although Rottenburg stated at one point that Plaintiff could sit for only one hour per workday, Dr. Lawley noted that she was "relatively pain free when . . sitting or lying down (Tr. 156). Plaintiff acknowledged to Dr. Lawley that cortisone injections to the elbow provided relief for three to six months, which contrasts with Rottenburg's opinion that she experienced either extreme or marked upper extremity limitations (Tr. 147, 179). Substantial evidence, drawn from both Plaintiff's acknowledged activities and her medical records supports the ALJ's rejection of Rottenburg's disability pronouncement.[2]

---

[2]Plaintiff disputes the ALJ's treatment of Dr. Touchton's opinion, submitting that the administrative analysis improperly discounted Touchton's findings on the basis that

### C. Past Relevant Work

Plaintiff also maintains that the vocational analysis was defective, arguing that the ALJ's misreading of the VE's testimony tainted his ultimate finding that Plaintiff could perform her former job as a clerical worker. *Brief* at 35. She argues further that the errors were compounded by the ALJ's incomplete hypothetical question and an RFC that did not encompass her upper extremity limitations. *Id.*

Contrary to Plaintiff's contention, the hypothetical question, repeated verbatim above, appears to encompass the limitations set forth in the December, 2002 Residual Functional Capacity Assessment (Tr. 110-114). Despite the fact that the ALJ's hypothetical appears to skirt a number of legitimate exertional limitations set forth by Plaintiff's treating sources, this "error," if it can be deemed as such, is rendered harmless by the fact that substantial evidence supports the ALJ's more plausible ultimate conclusion that Plaintiff could perform only sedentary level work[3] (Tr. 22). Moreover,

---

Plaintiff consulted him "in conjunction" with a pending legal claim against another physician (Tr. 20). However, as pointed out by the ALJ, "the treating relationship between Dr. Touchton and the claimant is unknown and not supported by treatment notes" (Tr. 20). Assuming *arguendo* that Touchton can be classified as a "treating" rather than a consultive source, his opinion is nonetheless subject to reduced weight based on *Wilson*'s requirement that the ALJ consider length of the treatment relationship and the frequency of examination.

[3]Plaintiff also contends that the VE's conclusion that she could perform clerical work overestimated her upper extremity abilities. However, the VE's finding that a clerical position required "the average industrial use of both upper extremities" is modified that by his prior statement that "[c]lerical people will use whatever hand they want, and they're not working full-time, they work in bursts. There's a lot of flexibility there" (Tr. 282). Moreover, although Dr. Lawley cautioned Plaintiff to avoid "frequent or repetitive squeezing, grasping, and lifting type of activities using her left hand," the VE's discussion indicates that such activities would not be

because the use of a VE is not required in a Step Four determination, an arguably inadequate hypothetical question is not fatal to the administrative decision. *Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987) ; *Walker v. Secretary of Health and Human Services,* 884 F. 2d 241, 245 (6th Cir. 1989). *See also Mays v. Barnhart,* 78 Fed. Appx. 808, 813-814 (3rd Cir. 2003)

       Likewise, Plaintiff's argument that a flawed RFC justifies a remand fails on the basis that the ultimate conclusion that she could perform sedentary clerical work is amply supported by the record. The RFC, while otherwise setting out a functional capacity for sedentary work, states that Plaintiff retains the ability to sit, stand, or walk for up to *eight* hours a day (Tr. 21). This finding, which stands at odds with the rest of the ALJ's decision, is apparently an oversight or typographical error. In another case, such a discrepancy between the RFC and the ultimate conclusion might direct a remand. However, the apparent misstatement does not taint the ALJ's supportable conclusion that Plaintiff could perform sedentary work. While the Court does not trivialize Plaintiff's legitimate impairments, it appears that upon remand, at best, she could expect a reissued decision, changing "sit, stand or walk for a total of *eight* hours" to read "*two*" or "*six*," but finding otherwise, once again, that she is capable of performing sedentary clerical work. "[W]here remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v.*

---

required on a repetitive or frequent basis in a sedentary, clerical position (Tr. 143, 145).

*Commissioner of Social Sec.* 378 F.3d 541, 547 (6th Cir. 2004); *citing NLRB v. Wyman-Gordon,* 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)(plurality opinion).

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained

within the objections.

                                                        s/R. Steven Whalen
                                                        R. STEVEN WHALEN
                                                        UNITED STATES MAGISTRATE JUDGE

Dated:  September 22, 2006

                                                        CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 22, 2006.

                                                        s/Susan Jefferson
                                                        Case Manager